## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LAUREN SPILLER-HOLTZMAN,

      *Plaintiff*,

      v.

UNIVERSITY OF MARYLAND,
BALTIMORE,

      *Defendant.*[1]

Civil No.: 1:22-cv-00514-JRR

## MEMORANDUM OPINION

Pending now before the court is Defendant University of Maryland, Baltimore's (the "University") Motion for Summary Judgment (ECF No. 62, "the Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Motion will be granted.

## I.    UNDISPUTED FACTUAL BACKGROUND

This action arises from Plaintiff's employment with, and termination from, the University's School of Medicine. Defendant seeks summary judgment on Plaintiff's claims of gender and race-based discrimination, hostile work environment, retaliatory hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000(e)) and the Maryland Fair Employment Practices Act ("MFEPA") (Maryland Code State Government § 20-601) and harassment in violation of MFEPA. Except where noted, the following factual background is undisputed.

---

[1] In its memorandum opinion at ECF No. 38, the court dismissed this action as against the State of Maryland. (ECF No. 38 at p. 16.) Accordingly, Madam Clerk shall update the docket to reflect that this action proceeds as against only the University of Maryland, Baltimore.

### A. Plaintiff's Employment with the University

Plaintiff, a white woman, began working for the University's School of Medicine in 1998. (ECF No. 4 ¶¶ 10, 12; ECF No. 40 ¶¶ 10, 12; ECF No. 62-5, Spiller-Holtzman Dep. Tr. 11:4–5.) Plaintiff worked in the School of Medicine's Gerontology department from 1988 until 2010, when she resigned.  (ECF No. 62-5, Spiller-Holtzman Dep. Tr. 11:11–12:5.)  Plaintiff returned to the University in 2011 and worked in various positions in the University's School of Nursing and School of Medicine until 2016.  *Id*. Tr. 12:8 – 13:12.

In November 2016, Plaintiff began working as a clinical research specialist at the University's School of Medicine's Radiology Department (the "Department").  *Id*. Tr. 14:6–15:6. In this role, her first direct supervisor was Dr. Rao Gullapalli, the Department's vice chair for research; then, beginning in spring of 2017, her direct supervisor was Ms. Aslihan Nuri.  *Id*. Tr. 30:15–31:3.  Dr. Gullapalli is an Indian man.  *Id*. Tr. 24:21–25:1. During her tenure in the Department, Plaintiff worked with three other clinical research specialists, Ms. Ranyah Almardawi, Mr. Tirth Koirala (until January 2017), and Katerina Leparskaya (starting in June 2018).  *Id*. Tr. 21:19–22:9; 25:2–25:16.

The Department relied on two types of research funding: external funding and internal funding.  (ECF No. 62-4, Melhem Dep. Tr. 24:10–17.)  The Department received external funding from grants of the National Institutes of Health or pharmaceutical companies.  *Id*. Tr. 25:1–4. Alternatively, the Department funded its research with revenue generated by its own clinical work. *Id*. Tr. 24:15–22.

### B. Plaintiff's Allegations of Discrimination

Plaintiff alleges that Dr. Gullapalli discriminated against and harassed her. She insists that Dr. Gullapalli created a workplace culture wherein women who socialized with and complimented him received promotions and raises, and those who did not were excluded and treated with hostility. (ECF No. 69-1 at p. 4.)

Plaintiff points to the following interactions to support her claims. First, during a staff meeting in February 2017, Dr. Gullapalli informed his staff that he had undergone an MRI and the doctor who conducted the MRI made a comment that Dr. Gullapalli's prostate was "huge." (ECF No. 62-5, Spiller-Holtzman Dep. Tr. 42:3–44:4.) Plaintiff testified at deposition that Dr. Gullapalli's comments regarding his prostate were "perhaps not" harassment but were "very inappropriate for the setting." *Id*. Tr. 44:22–45:6.

Second, Plaintiff alleges that, in December 2017, Dr. Gullapalli called her at her desk in response to a question Plaintiff had sent him by email. *Id*. Tr. 45:19–46:13. During the phone call, Dr. Gullapalli spoke in "a really breathy" manner that Plaintiff did not perceive to be due to exercise. *Id*. at Tr. 46:2–47:13. Plaintiff stated that the content of Dr. Gullapalli's comments during this phone call were not inappropriate. *Id*. Tr. 47:16–19.

Third, on December 15, 2017, Dr. Gullapalli invited Plaintiff by email to a restaurant for lunch with the Department to celebrate the holidays. (ECF No. 62-8.) Plaintiff responded to the email invitation that she could not attend because she was busy. *Id*. Ms. Nuri then encouraged her to attend for "a little bit." *Id*. Plaintiff did not attend. (ECF No. 62-5, Spiller-Holtzman Dep. Tr. 29:2–18.) Following the lunch, Ms. Almardawi allegedly told Plaintiff that Dr. Gullapalli "controls everything and if you want to get ahead . . . you have to be friendly and socialize with him." *Id*. Tr. 29:17–30:1. Plaintiff avers she responded that she does not "kiss up to people to get ahead." *Id*. Tr. 30:5–7. During her sworn deposition, Plaintiff acknowledged that Dr. Gullapalli's

lunch invitation did not constitute sexual harassment but said she "couldn't sit [at the lunch] comfortably." *Id.* Tr. 41:2–7.

Fourth, on two occasions, Dr. Gullapalli got "very close" to Plaintiff and "sort of box[ed] her] in so [she] couldn't get out of places." (ECF No. 69-3, Spiller-Holtzman Dep. Tr. 49:16–20). In the first instance, Dr. Gullapalli and Dr. Nuri came up to Plaintiff's desk to ask her to come to the holiday lunch and got so close to her desk that Plaintiff had to push past them to leave her desk. *Id.* Tr. 49:22–50:7. The second instance occurred when Plaintiff went to Dr. Gullapalli's office for her annual performance review. *Id.* Tr. 50:21–51:1. When Plaintiff entered the room, Dr. Gullapalli sat at his desk, and Ms. Nuri sat at a chair in front of the desk closer to the door; Plaintiff had to go past Ms. Nuri to get to the chair in the corner. This experience immediately made Plaintiff "very uncomfortable." *Id.* Tr. 51:9–21. During that same meeting, Dr. Gullapalli threated Plaintiff with "a letter in [her] personnel file" and told her to come to him directly with complaints rather than to file complaints through the University's internal Human Resources reporting system, EthicsPoint.[2] *Id.* Tr. 52:1–15.

Fifth, Plaintiff generally asserts that she resisted Dr. Gullapalli's efforts to seduce her, and that this led to her termination. *Id.* Tr. 84:1–5; 85:6–12. When asked at deposition what Dr. Gullapalli did to attempt to seduce her, Plaintiff described panting on the phone call and said that, when she sat at a table with Dr. Gullapalli, "he'd like stare into my eyes and he would do this thing with his lips and it was directed right at me." *Id.* Tr. 86:7, 86:9–13.

Finally, Plaintiff avers that Dr. Gullapalli's discriminatory behavior towards her is evident in his favoritism of Ms. Almardawi. *Id.* Plaintiff alleges that Dr. Gullapalli endeavored to increase

---

[2] The University maintains a hotline known as "EthicsPoint" whereby students, faculty, and/or staff can report known or suspected violations of law, regulation, or policy, including "discrimination, harassment, safety, research and academic integrity, data privacy, financial impropriety, fraud conflicts of interest, and human resources issues." UMB Hotline FAQs, https://www.umaryland.edu/umbhotline/umb-hotline-faqs (last visited Sep. 16, 2025).

Dr. Almardawi's salary beyond Plaintiff's salary despite Dr. Almardawi's inexperience compared to Plaintiff. *Id*.[3]

### C. Plaintiff's Complaints of Discrimination and Performance Evaluations

The day after the Department holiday lunch, which Plaintiff did not attend, she filed an anonymous complaint in the University's EthicsPoint Hotline regarding the lunch. (ECF No. 62-9.) In the complaint, she anonymously reported that she was "told by a colleague that [her] job and promotions are in jeopardy if [she didn't] become friends with Rao gullapalli." *Id*. at p. 3. Eight days after her first complaint, she filed a second EthicsPoint complaint regarding the same lunch. (ECF No. 62-10.) Therein, she indicated that she did not have access to the account from which she filed the first complaint and was thus filing the second so she could keep track of any follow up. *Id*. at p. 2. On May 22, 2018, Plaintiff filed another EthicsPoint complaint alleging anticipated retaliation for not attending the holiday lunch. (ECF No. 62-11.) Plaintiff alleged she feared Ms. Nuri would retaliate against her by giving her a negative annual review. *Id*. In response to her complaints, the University's Title IX officer declined to launch an investigation based on the conclusion that Plaintiff's allegations did not involve sexual harassment. (ECF No. 62-6 at p. 7.)

On May 29, 2018, Plaintiff received her 2017-2018 annual performance evaluation. (ECF No. 62-12.) Ms. Nuri prepared the report. *Id*. Plaintiff received "meets standards" or "above standards" ratings in every category. *Id*. In the comments of her report, Ms. Nuri wrote that

---

[3] The only record citation Plaintiff supplies for her assertion that "[d]espite Ms. Spiller having 18 more years of experience, Dr. G actively sought to increase Almardawi's salary beyond that of Ms. Spiller's" is "Ex. 37, Interrogatory Responses at 12." In Exhibit 37 (ECF No. 69-39), in answer to the twelfth interrogatory – "State all facts and identify all documents upon which you base your contention that Ranyahh Almardawi was 'similarly situated' to Plaintiff, as alleged in paragraph 19 of your complaint" – Plaintiff responds "Ms. Almardawi and Plaintiff had the same position, reported to the same supervisor, had substantially the same duties and were the functional equivalent in position title and responsibilities." (ECF No. 69-39 at p. 13.) Plaintiff provides no record citation in support of the assertion that Dr. Gullapalli actively sought to increase Ms. Almardawi's salary beyond that of Plaintiff.

Plaintiff needed to "work on becoming a better team player and to build stronger relationships with all members of the research team." *Id*. at p. 3. Plaintiff elected to include her own comments in the report wherein she stated she does not agree with Ms. Nuri's comments and added "I am not sure how I can rate above standards if I have so many issues." *Id*. at p. 4. In her deposition, Plaintiff described the performance evaluation as "earth shattering to me." (ECF No. 62-5, Spiller-Holtzman Dep. Tr. 51:8–9.)

On June 6, 2018, Plaintiff filed a Whistleblower Complaint Form with the Maryland Office of the Statewide Equal Employment Opportunity Coordinator ("OSEEOC"). (ECF No. 62-6.) In the complaint, Plaintiff alleged that Dr. Gullapalli asked her to "violate federal human research protections regulations" and to "breach [her] confidentiality agreement." *Id*. at p. 2. Plaintiff also included her allegations about the holiday lunch and Dr. Gullapalli's comments about his enlarged prostate. *Id*. at pp. 6–7. OSEEOC investigated the complaint and concluded there was no evidence to support Plaintiff's claims of a Maryland Whistleblower Law violation. (ECF No. 62-13.)

On August 27, 2018, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission for Civil Rights ("MCCR"). (ECF No. 62-14.) In the complaint, Plaintiff alleged retaliation and harassment based on her gender and cited the holiday lunch and Dr. Gullapalli's prostate comments. *Id*. Additionally, Plaintiff stated she was transferred to work in a group with researchers that involved travel. *Id*. In her deposition, however, Plaintiff clarified that this transfer had not actually taken place. (ECF No. 62-5, Spiller-Holtzman Dep. Tr. 66:9–12.) The MCCR investigated Plaintiff's allegations – including holding a fact-finding conference on July 30, 2019 – and issued a written

finding on July 28, 2020, concluding that Plaintiff failed to establish she was subject to sex discrimination, hostile work environment, or retaliation. (ECF Nos. 69-38; 62-7 at p. 13.)

In addition to her OSEEOC, EEOC, and MCCR complaints, Plaintiff continued to file numerous EthicsPoint complaints. (ECF No. 62-15.) In total, Plaintiff filed more than ten complaints between 2017 and 2019. *Id*. All of her complaints were determined to be unsubstantiated. *Id*.

On May 29, 2019, Plaintiff received her 2018-2019 performance evaluation. (ECF No. 62-16.) Plaintiff received "meets standards" evaluations in all areas other than "cooperation and teamwork" where she received a "below standards" rating. *Id*. at pp. 4–6. Ms. Nuri noted "there is no effective communication between [Plaintiff] and her supervisor." *Id*. at p. 5. Plaintiff included her response in the report to state her communication with Ms. Nuri was "limited because I find that when I do ask her a question, she usually does not know the answer." *Id*. at p. 6.

### D. Plaintiff's Termination

In July 2019, Dr. Elias Melhem, Chair of the Department, informed Dr. Gullapalli that the Department did "not have enough money left to support unfunded research and that his team need[ed] to find ways to cut costs." (ECF No. 62-4, Melham Dep. Tr. at 25:16–19.) The Department, thus, was required to make budgetary cuts with regard to research that was not externally funded. *Id*. Tr. 25:13-15.[4] Dr. Melhem instructed Dr. Gullapalli to generate ways to cut about $400,000 from the Department's budget. (ECF No. 62-18.)

Following this instruction, Dr. Gullapalli initiated the process of requesting to lay off employees by filling out a form for review by Jessica Bird, the University's School of Medicine's

---

[4] Plaintiff avers that the Department faced "consistent budget deficits" during her tenure. (ECF No. 69-1 at p. 10.) But her record citation does not remotely support this citation. *See Id.* (citing ECF No. 69-6, Melhem Dep. Tr. 17:10-14 "Q: Am I correct that there were – there was a monthly meeting you held with Dr. Gullapalli and his administrator to talk about various action items within the department? A: Yes.").

Executive Director for Human Resources. (ECF No. 62-19, Bird Dep. Tr. 21:13–21.) Per University policy, following Ms. Bird's review of the form, the request was reviewed by the Assistant Dean for Finance, the Department of Employee and Labor Relations, and the layoff committee including a member of the University's Office of General Counsel. *Id.* Tr. 21:13–22:3. Dr. Nuri submitted layoff forms for Plaintiff and Katerina Leparskaya. (ECF Nos. 62-20, 62-21.) The reason provided for the proposed layoffs was lack of funding. *Id.* In 2019, eight percent of Plaintiff's work, and zero percent of Ms. Leparskava's work, was funded by grants and contracts (*i.e.* external funding). (ECF No. 62-25 at p. 6.) In contrast, 50% of Ms. Almardawi's work was externally funded. *Id.*

On December 9, 2019, following confirmation by the Assistant Dean for Finance that the Department was in fact experiencing budgetary issues, and approval by the Executive Director for Human Resources and the Department of Employee and Labor Relations, the layoff request was approved. (ECF No. 62-19, Bird Dep. Tr. 22:13–23:11; ECF No. 62-23.) By letter ten days later, Ms. Nuri informed Plaintiff that "due to lack of funding" her position would be eliminated and she would be laid off effective March 18, 2020. (ECF No. 62-24.)

Under University policy, the Department was not permitted to hire a replacement for laid off workers. (ECF No. 62-19, Bird Dep. Tr. 43:13-19.) Department employees maintained at depositions that neither Plaintiff nor Ms. Leparskava was replaced. (ECF No. 62-17, Dreizin Dep. Tr. 35:14–20; ECF No. 62-22, Nuri Dep. Tr. 115:12–116:2.) Ms. Almardawi remained as the only clinical research specialist in the Department until her resignation in 2021. (ECF No. 62-22, Nuri Dep. Tr. 122:5-22.) In 2022, the Department hired Charlesa Plummer, born in the United States, as a replacement for Ms. Almardawi. *Id.* Tr. 122:5-123:10; 143:10-19. Plaintiff insists the

Department posted positions for clinical research assistants after her termination in 2020. (ECF No. 69-3, Spiller-Holtzman Dep. Tr. 77:1–18; ECF No. 69-41.)

Following her termination, Plaintiff made additional complaints of discrimination, culminating in the instant action. On February 7, 2020, Plaintiff filed a second whistleblower complaint with OSEEOC alleging violations of the Maryland Whistleblower Law. (ECF No. 62-26.) The OSEEOC conducted an investigation and dismissed the complaint. (ECF No. 62-27.) On June 14, 2020, Plaintiff filed a second charge with the EEOC and MCCR. (ECF No. 62-28.) Therein, Plaintiff alleged a hostile work environment and that termination of her employment was retaliation for her protected activity and based on her race, sex, and age. *Id.* The EEOC made no finding of discrimination and issued a notice of right to sue. (ECF No. 4 at pp. 25–26.)

## E. Procedural Posture

On March 3, 2022, Plaintiff initiated this action in the Circuit Court for Baltimore City against Defendants University of Maryland, Baltimore and the State of Maryland. (ECF No. 4.) In the Complaint, she alleged the following causes of action:

> Count I: Disparate Treatment Gender Discrimination in Violation of Maryland Code, State Government Title 20-601, *et seq* and Title VII 42 U.S.C. § 2000(e), *et seq*.;
>
> Count II: Disparate Treatment Gender Discrimination (Hostile Work Environment) in Violation of Maryland Code, State Government Title 20-601, *et seq.* and Title VII 42 U.S.C. § 2000(e), *et seq*.;
>
> Count III: Retaliation in Violation of Maryland Code, State Government Title 20-601, *et seq.* and Title VII 42 U.S.C. § 2000(e), *et seq*.;
>
> Count IV: Retaliatory Hostile Work Environment in Violation of Maryland Code, State Government Title 20-601, *et seq.* and Title VII 42 U.S.C. § 2000(e), *et seq*.;

Count V: Discrimination (Age) in Violation of Maryland Code, State Government Title 20-601, *et seq*. and The Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*.;

Count VI: Discrimination (Race) in Violation of Maryland Code, State Government Title 20-601, and Title VII of the Civil Rights Act of 1964; and

Count VII: Harassment in Violation of State Government Title 20-606(5), *et seq*.

Following Defendants' motion to dismiss the Complaint (ECF No. 15), this court dismissed the Complaint as against Defendant State of Maryland, dismissed Plaintiff's claims of age discrimination under the ADEA and MFEPA (Count V), and dismissed Plaintiff's claims of gender discrimination, retaliation, and race discrimination under MFEPA as untimely. (ECF Nos. 38, 39.)

Plaintiff's surviving claims against the University are Title VII gender discrimination (Count I), Title VII and MFEPA gender-based hostile work environment (Count II), Title VII retaliation (Count III), Title VII and MFEPA retaliatory hostile work environment (Count IV), Title VII race discrimination (Count VI), and MFEPA harassment (Count VII).[5]  Following discovery, the University moved for summary judgment on the remaining claims. (ECF No. 62.)

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[5] As discussed below, in her response to the Motion, Plaintiff admits there is no record support for her claim of race-based discrimination.  (ECF No. 69-1 at p. 26 n.13.)  The court agrees; and the University is therefore entitled to judgment on Count VI as a matter of law.

A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court "must not weigh evidence or make credibility determinations."  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

III.    <u>**ANALYSIS**</u>

A. **Plaintiff's Gender Discrimination Claims (Count I)**[6]

Defendant moves for summary judgment on Plaintiff's claim of gender discrimination on the grounds that Plaintiff has not produced evidence in support of a *prima facie* case of gender discrimination, and, even if she has or could, she has not generated a genuine dispute of material fact that Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual. (ECF No. 62-1 at pp. 16–22.) In response, Plaintiff argues that she has established a *prima facie* case, but she does not address Defendant's asserted nondiscriminatory reasons for her termination. (ECF No. 69-1 at pp. 26–27.)

Title VII forbids employment practices that discriminate against an employee based on, relevant here, sex. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025) (citing 42 U.S.C. § 2000e *et seq*). "Disparate treatment occurs when an employer treats certain people less favorably than others on the basis of a protected classification." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019) (quoting *Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994)). "A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792 (1973)], and its progeny." *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)). "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Cole v. Fam. Dollar Stores of Md.,*

---

[6] Plaintiff concedes that "[t]he facts in the summary judgment record do not support the conclusion that the adverse actions or employment decisions were based on Ms. Spiller's race and there is no record based opposition that Ms. Spiller can support on that theory." (ECF No. 69-1 at p. 26 n.13.) Accordingly, the court addresses Plaintiff's gender-based disparate treatment claims only.

*Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)).

Absent direct evidence, as is the case here, a plaintiff must establish a *prima facie* case pursuant to the *McDonnell Douglas* framework.[7]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Pursuant to the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  To establish a *prima facie* case of discrimination, a plaintiff must demonstrate: "(1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ."  *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021) (citing *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for [the employment action]."  *McDonnell Douglas Corp.*, 411 U.S. at 802.  The employer's burden "is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  "Once 'an employer articulates a reason for discharging the plaintiff not forbidden by law,' [the court] do[es] not evaluate 'whether the reason was wise, fair, or even correct.'" *Wannamaker-Amos*, 126 F.4th at 256–57 (quoting *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017)).

---

[7] Plaintiff does not reference any direct evidence and argues only that she has satisfied *McDonnell Douglas*.  (ECF No. 69-1 at p. 13.)

If the employer carries its burden of production, "the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'" *Wannamaker-Amos*, 126 F.4th at 255 (quoting *Burdine*, 450 U.S. at 253). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Defendant first urges that it is entitled to summary judgment on Plaintiff's Count I, as Plaintiff has not demonstrated a *prima facie* case of gender-based discrimination. In response, Plaintiff contends her "gender discrimination claim is straight forward." (ECF No. 69-1 at p. 27.) Plaintiff elaborates that she received negative performance evaluations and was terminated because she did not "suck up, do favors or be 'nice' to" Dr. Gullapalli. *Id.*

1. *Prima Facie Case*

In demonstrating a *prima facie* case, an adverse employment action is one which has a "direct or indirect impact on an individual's employment;" said differently, it must cause a material change in the "terms and conditions of [the individual's] employment." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015). "Examples of adverse employment actions include 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion.'" *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018) (quoting *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)). "[R]eprimands and poor performance evaluations occur with some frequency in the workplace . . . [and] are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent." *Adams*, 789 F.3d at 431. A performance evaluation may be an adverse employment action "where

14

the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004), *abrogated on other grounds by Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024).

In Plaintiff's 2018 Performance Review, her performance is described as meeting standards in four categories and above standards in three categories. (ECF No. 62-12). Plaintiff's 2019 Performance Review describes her performance in two categories as above standards and otherwise as meeting standards. In only one area did she receive "below standards:" cooperation and teamwork, interpersonal relationships. (ECF No. 62-16 at p. 4.) The 2019 Performance Review stated that Plaintiff did not communicate with her team and that she should improve her interpersonal skills and work on becoming a better team player. *Id.*

On the whole, Plaintiff's Performance Reviews are not negative. The 2018 Performance Review contains no "below standards" evaluations; and of the 14 rated areas in the 2019 Performance Review, only one was "below standards," as recited above. Nonetheless, Plaintiff cites Dr. Nuri's responses regarding the Department's layoff requests wherein she states that Dr. Almardawi "had an outstanding performance in her last performance review" and Plaintiff "has been about meet standards for the last couple reviews" to argue that Defendant engaged in "retaliatory use of evaluations [that] demonstrate[] a pattern of adverse treatment directed at [Plaintiff]." (ECF No. 69-1 at p. 28 (citing ECF No. 69-17 at p. 5.)) In this manner, Plaintiff introduces some evidence that her relatively lower ranking performance evaluation was used to alter the terms or conditions of her employment; and while this evidence may not be substantial, on a Rule 56 motion, the court is not to weigh the evidence. Thus, the court considers both the

performance evaluations and Plaintiff's termination as adverse employment actions for purposes of her *prima facie* case.

Plaintiff, however, fails to generate a triable issue of fact on the fourth element of a *prima facie* case: "the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *See Sempowich*, *supra*. One way to demonstrate this reasonable inference is to show that after Plaintiff's termination, her "position remained open or was filled by similarly qualified applicants outside of the protected class." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Another way is to show the existence of a similarly situated comparator outside of the protected class who was subjected to different treatment. *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 572 (4th Cir. 2023) (citation omitted). While Plaintiff is "not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim," *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir.2003)), she must still "present evidence that reasonably creates an inference of an unlawfully discriminatory motive to shift the burden to" Defendant. *Noonan*, 84 F.4th at 573.

Plaintiff presents no evidence that her role or Ms. Leparskava's role was filled following termination. Further, it is undisputed that University policy prohibited the Department from doing so. (ECF No. 62-19, Bird Dep. Tr. 43:13-19; ECF No. 62-22, Nuri Dep. Tr. 115:12–116:2; 122:5–22.) Adding to that, it is undisputed that Ms. Almardawi remained as the only clinical research specialist in the Department until her 2021 resignation. (ECF No. 62-22, Nuri Dep. Tr. 122:5-22.) Upon her resignation, the Department hired Charlesa Plummer, another woman, as a replacement for Ms. Almardawi. *Id*. Tr. 122:5-123:10; 143:10-19.

Plaintiff insists the Department posted positions for clinical research assistants after her termination in 2020.  (ECF No. 69-1, Spiller-Holtzman Dep. Tr. 77:1–18; ECF No. 69-41.)  But, Plaintiff admits that these were not postings to hire a candidate for her role.  (ECF No. 69-1 at pp. 11, 22.)  Further, Plaintiff points to no record evidence as to whether the postings resulted in filling her former role.  Ms. Nuri maintains that while other labs or programs within the Department may have been able to hire new research assistants based on the terms of their grant-funded projects, her department did not hire anyone new and the Department did not hire anyone whose role was not fully funded by grants and contracts.  (ECF No. 62-22, Nuri Dep. Tr. 113:18–116:2.)  Plaintiff thus fails to present evidence to generate a triable issue that her position remained open or was filled by a candidate outside of her protected class.

Plaintiff also fails to identify a comparator to generate a triable issue of fact regarding an inference of discrimination.  In her response to the Motion, Plaintiff identifies Ms. Almardawi as a comparator.  (ECF No. 69-1 at p. 27.)  Plaintiff contends: "Unlike Ms. Spiller, who resisted Dr. G's expectations, Ms. Almardawi remained in favor and retained her position, demonstrating that she falls outside the protected class . . . ."  *Id*.  Ms. Almardawi, like Plaintiff, is a woman and is thus not outside of Plaintiff's protected class for her gender discrimination claim.  *See Floyd v. U.S. Dep't of Homeland Sec.*, RDB-09-0735, 2009 WL 3614830, *8 (D. Md. Oct. 27, 2009) ("A plaintiff cannot establish a claim of disparate treatment by referencing a comparator of the same protected class.")  Plaintiff thus fails to establish a *prima facie* case of gender discrimination.

The court notes that Plaintiff suggests that she experienced "sex stereotyping" in violation of Title VII.  (ECF No. 69-1 at pp. 26–27.)  In support her claim that "'sex stereotyping' is an actionable form of discrimination under Title VII," Plaintiff cites *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), and *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989).  (ECF No. 69-1 at pp. 26–27.)  In *Price Waterhouse*, the Supreme Court described sex stereotyping as "evaluat[ing] employees by assuming or insisting they matched the stereotype associate with their group."  490 U.S. at 251.  The Court proceeded to identify comments that an "aggressive female employee" required "a course at charm school" as examples of sex stereotyping.  *Id*. at 255.  In *Grimm*, the Fourth Circuit held that a policy restricting bathroom use by the sex marker on students' birth certificates was a form of sex stereotyping against transgender students, as the policy "punish[ed] transgender persons for gender non-conformity, thereby relying on sex stereotypes."  972 F.3d at 608.  *See also M.A.B. v. Board of Ed. of Talbot Cnty*, 286 F. Supp. 3d 704, 715 (D. Md. 2018) (holding that locker room access policy subjected transgender plaintiff to sex discrimination under a sex stereotyping theory).

Here, Plaintiff's theory of sex stereotyping appears to be that Dr. Gullapalli "created situations where female employees had to suck up, do favors or be 'nice' to him."  (ECF No. 69-1 at p. 27.)  Importantly, however, Plaintiff nowhere alleges or introduces evidence to suggest that only female, and not male employees, were expected to be kind to, or socialize with, Dr. Gullapalli. There is not a scintilla of evidence, even accepting that Dr. Gullapalli favored employees who socialized with or flattered him, that this was not a sex-neutral approach.  In other words, Plaintiff introduces no evidence to create a triable inference of sex discrimination, because, drawing all inferences in her favor as non-movant, Dr. Gullapalli rewarded his employees – male and female alike  – for "kiss[ing] up" to him.  (ECF No. 69-3, Spiller-Holtzman Dep. Tr. 30:6.)  No evidence suggests or supports a reasonable conclusion or inference that he expected only female employees to exhibit friendly, social behavior toward him.   This does not amount to sex stereotyping.  *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 126 (4th Cir. 2021) (describing sex-based

stereotypes as those that "appear to rest on nothing more than conventional notions about the proper station in society for males and females").

2. *Pretext*

Even were the court to find Plaintiff demonstrates a *prima facie* case of disparate treatment on the basis of sex, or that she has generated a genuine dispute of material fact related to same, her claims would still fail because she cannot satisfy the ultimate burden she bears. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) and *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981), *supra*. Defendant has "set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *See Hicks*, 509 U.S. at 507, *supra*. Namely, Defendant introduces undisputed, uncontroverted evidence that, in July 2019, Dr. Melhem advised Dr. Gullapalli that the Department needed to cut costs in internally funded research, and instructed him accordingly. (ECF No. 62-4, Melhem Dep. Tr. 25:16–19; ECF No. 62-18).[8]

"[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Courts may not act as "a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id*. at 300 (internal quotation omitted).

---

[8] As described footnote 5, *supra,* to the extent Plaintiff generally avers that Defendant's budgetary constraints are pretextual in that the Department experienced budget restrictions throughout her employment, Plaintiff fails to introduce evidence to support such a proposition. *See* ECF No. 69-1 at p. 10 (citing ECF No. 69-6, Melhem Dep. Tr. 17:10-14).

To demonstrate pretext, a plaintiff must prove "both that the reason was false, and that discrimination was the real reason." *Adams v. Trustees of Univ. of N.C.- Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).  To show pretext, "a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)

Plaintiff does not address Defendant's proffered nondiscriminatory reason for her termination; nor does she argue, as relates to her Title VII gender-based discrimination claim, that Defendant's reasons for termination were pretextual.  A plaintiff "must establish causation at two different stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying her ultimate burden of persuasion." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015).  Plaintiff has not established a *prima facie* case of gender discrimination in violation of Title VII, and she does not argue that Defendant's nondiscriminatory reason for her termination was pretextual.  Accordingly, she has not generated a triable issue of fact to proceed to trial on Count I and Defendant is entitled to judgment as a matter of law as to same.

## B. Plaintiff's Hostile Work Environment, Retaliatory Hostile Work Environment, and Harassment Claims (Counts II, IV, and VII)

In Count II, Plaintiff alleges she was subject to a hostile work environment in violation of Title VII and MFEPA.  In Count IV, she alleges a retaliatory hostile work environment in violation of Title VII and MFEPA.  And in Count VII, she alleges harassment in violation of MFEPA. Defendant moves for summary judgment on all three claims on the grounds that Plaintiff presents no evidence to generate a triable issue that the alleged discriminatory conduct was severe or

pervasive enough to amount to a hostile work environment, or that the alleged conduct was connected to Plaintiff's gender or protected activity.

As a threshold matter, MFEPA is the state law analogue to federal employment discrimination statutes. *Ensor v. Jenkins*, No. CV ELH-20-1266, 2021 WL 1139760, at *18 (D. Md. Mar. 25, 2021). Accordingly, "[c]ourts apply Title VII precedent, including the burden-shifting framework, to discrimination, retaliation, and harassment claims brought under the MFEPA." *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196 (D. Md. 2025) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). Thus, the court will analyze Plaintiff's MFEPA claims of harassment, hostile work environment, and retaliatory hostile work environment in conjunction with her Title VII claims of hostile work environment and retaliatory hostile work environment. *See Hammoud v. Jimmy's Seafood, Inc.*, No. CV MJM-21-1592, 2024 WL 2749696, at *9 (D. Md. 2024) (noting "the Court will generally apply the standards for a Title VII hostile work environment claim to the merits of Plaintiff's workplace harassment claim under MFEPA.").

To survive a motion for summary judgment on these claims, Plaintiff must generate triable issues that the alleged harassment: (1) was unwelcome; (2) resulted because of her gender, race, or prior protected activity; (3) was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) "there is some basis for imposing liability on the employer." *Magassouba*, 773 F. Supp. 3d at 224 (quoting *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)). For her retaliatory hostile work environment claims, Plaintiff must produce evidence to support a reasonable finding of the adverse action, "causal connection elements of a retaliation claim," and the *prima facie* elements of a hostile work environment claim. *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013). Importantly, the *McDonnell Douglas*

21

burden-shifting framework does not apply to hostile work environment claims. *Magassouba*, 773 F. Supp. 3d at 224.

1. *Severe or Pervasive Behavior*

In her response to the Motion, Plaintiff argues that "direct threats, coupled with the use of negative performance reviews" constitute a retaliatory hostile work environment. (ECF No. 69-1 at pp. 24–25, 26.)  As the non-movant, the court construes the above-described instances in the light most favorable to Plaintiff.   Nonetheless, the evidence of direct threats and negative performance reviews, even along with that of Dr. Gullapalli's comment about the size of his prostate during a Department meeting, Dr. Gullapalli's phone call to Plaintiff wherein he breathed heavily, and Dr. Gullapalli's invitation to Plaintiff (along with the rest of the Department) to a holiday lunch, fall far short of the severe and pervasive conduct this court has recognized as sufficient to support a finding of a hostile work environment.  *See, e.g., Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010) (providing that to establish a hostile work environment, discriminatory or retaliatory abuse must be "near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance.").

Establishing a sufficiently severe and pervasive environment is a "high bar."  *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).  Relevant here, "rude treatment by coworkers" or "a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII."  *Id.*  Additionally, hostile work environment claims generally involve "repeated conduct," not isolated incidents.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).  Conduct that "gives rise to an abusive work environment

must be both objectively and subjectively 'hostile' and 'abusive.'"  *McIver v. Bridgetone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022).

Here, the record evidence Plaintiff relies upon is hardly subjectively hostile, and certainly not objectively so.  Plaintiff repeatedly admits that the instances she cites were "not harassment," or had other, innocent explanations.  *See* ECF No. 62-5, Spiller-Holtzman Dep. Tr. 44:22–45:6 (describing the prostate comment as inappropriate for the setting but not harassment); *id.* Tr. 47:16–19 (admitting that Dr. Gullapalli did not make inappropriate comments during the breathy phone call); *id*. Tr. 41:2–7 (admitting Dr. Gullapalli's lunch invitation did not amount to sexual harassment).  It is plain that Plaintiff did not get along with Mr. Gullapalli or Ms. Nuri. Objectively, however, the incidents Plaintiff recounts do not amount to severe harassment or abuse; and no reasonable trier of fact could conclude they do.  The lunch invitation and prostate comment were made among other Department members and others accepted the invitation and laughed at the comment.  *Id*. Tr. 42:3–44:4; ECF No. 62-8.   As for the phone call, meeting, and negative performance review, these incidents, while perhaps disrespectful or unpleasant, do not amount to a hostile work environment; and no reasonable trier of fact could conclude they do.  *See Dangerfeld v. Johns Hopkins Bayview Med. Ctr., Inc.*, No. CV JKB-19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (explaining that "[w]orkplace interactions which are merely 'disrespectful, frustrating, critical, and unpleasant' do not create a hostile work environment").

*2.  Causal Relation to Gender or Protected Activity*

Even if Plaintiff could clear the high bar imposed by the severe and pervasive standard, her claims still fail to generate a triable issue as to whether she was harassed or discriminated against because of her protected status or activity.  *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000).  "Harassment due to personality conflicts will not suffice," *Ziskie v. Mineta*, 547 F.3d

220, 226 (4th Cir. 2008); Plaintiff must, and fails to, introduce evidence to show that the alleged abuse would not have been perpetuated against her but for her gender or protected activity. *Magassouba*, 773 F. Supp. 3d at 224.

As described above, two of the instances Plaintiff describes occurred in the presence of the whole Department. Against this backdrop, no evidentiary basis exists on which a factfinder might reasonably conclude Plaintiff was targeted with alleged abuse for her gender or complaints about Dr. Gullapalli. Plaintiff was treated the same as her co-workers of varying protected and non-protected status. With respect to the telephone call in December 2017 in which Dr. Gullapalli spoke in a "really breathy" manner and the 2018 performance review, Plaintiff does not allege Dr. Gullapalli said anything relating to her gender. Plaintiff maintains that during the performance review, Dr. Gullapalli alluded to her EthicsPoint Complaint. Even assuming this amounted to but-for causation, as described above, the conduct during that meeting does not amount to a severe or pervasive abuse even when viewed through the most permissive lens. Plaintiff fails to adduce any evidence to suggest that the offensive behaviors of which she complains were related to her gender or to any protected activity. To the extent Plaintiff relies on sex stereotyping as her theory of gender discrimination, for the reasons set forth above, such a theory is not available to her here.

Accordingly, Plaintiff fails to generate an issue of fact upon which a reasonable jury could find in her favor. Judgment on Counts II, IV, and VII will be entered in favor of Defendant.

## C. Plaintiff's Retaliation Claim (Count III)

Plaintiff alleges Defendant retaliated against her in violation of Title VII and MFEPA. As explained above, here, in the absence of direct evidence, the *McDonell Douglas* burden shifting framework applies to Plaintiff's retaliation claims arising under both Title VII and MFEPA. *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196 (D. Md. 2025). To establish a *prima*

24

*facie* case of retaliation, Plaintiff must establish (i) that she engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) a causal relationship between the protected activity and the adverse employment activity. *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 178 (D. Md. 2022). If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant employer to "offer a legitimate, nonretaliatory reason for [its] adverse action." *Barnhill v. Bondi*, 138 F.4th 123, 138 (4th Cir. 2025). If the employer meets this burden, "'the burden then shifts back to the . . . [employee] to prove by a preponderance of the evidence' that the employer's purported reason is pretext for intentional retaliation." *Id.* (quoting *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023)).

As to the first prong of Plaintiff's *prima facie* case, the parties do not dispute that Plaintiff engaged in protected activity, but diverge on the scope and instances of the protected activity. "'Protected opposition activity can take numerous forms,' from formal charges of discrimination to informal grievances or protests." *Siantou v. CVS Rx Servs., Inc.*, No. 8:17-CV-00543-PWG, 2018 WL 6479658, *9 (D. Md. Dec. 7, 2018) (quoting *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 n.4 (4th Cir. 2018)). "To warrant protection, the employee's perception of a violation must be objectively reasonable under the circumstances known to [her]." *Strothers*, 895 F.3d at 328 (quotations omitted).

Defendant insists that Plaintiff first engaged in protected activity when she filed her EEOC charge in August 2018 and, accordingly, any allegedly hostile or discriminatory acts that occurred before the filing of this charge cannot support a claim of retaliation. The court disagrees. Plaintiff made three complaints to the University's Human Resources department prior to her EEOC charge, each of which is an instance of protected activity. ECF Nos. 62-9, 62-10, 62-11. Defendant urges that the nature of these complaints is unrelated to Title VII-protected activity, but

25

that is not dispositive.  The substantive merit of Plaintiff's various complaints notwithstanding, Plaintiff invoked her entitlement to complain about what she viewed as sexual harassment in violation of Title VII.  ECF Nos. 62-9 (reporting that Ms. Almardawi told her that to succeed at her job she had to "get closer" to Dr. Gullapalli); 62-10 (reiterating substance of previous complaint); 62-11 (describing Plaintiff's phone call to Human Resources wherein she expressed concern that she would be retaliated against in her upcoming performance review because she had reported Dr. Gullapalli for sexual harassment).  To establish a *prima facie* case, Plaintiff must point to evidence in the record to establish a causal relationship between her various University and EEOC complaints of alleged sex-based harassment and her negative performance evaluations and termination.[9]

To establish the causation element of a *prima facie* case of retaliation, Plaintiff must be equipped to prove but-for causation; in other words, that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Foster*, 787 F.3d at 249.  To establish but-for causation, a plaintiff must cite "facts that alone, or in addition to temporal proximity, suggest[] that the adverse employment action occurred because of the protected activity."  *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021). Temporal proximity, alone, is not sufficient to establish that a plaintiff's protected activity was the "but-for" cause of adverse employment action.  *Harris v. Wormuth*, 669 F. Supp. 3d 477, 502 (D. Md. 2023).  And if a plaintiff relies on temporal proximity to show causation, the temporal proximity must be "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001);

---

[9] Plaintiff argues that her termination was "causally connected to the closure of her University complaints and the MCCR investigation."  (ECF No. 69-1 at p. 15.)  Plaintiff asserts: "[m]ultiple factors support this inference, providing a reasonable basis for a jury to conclude that her termination was retaliatory;" but Plaintiff fails to provide supportive record citations and does not elaborate on the purported multiple supporting factors.  Further, the University and MCCR's closure of complaints following investigation is not Title VII protected activity that could support a retaliation claim; Plaintiff introduces no authority to suggest otherwise.

*see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (providing that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two.").

To evaluate the temporal proximity of Plaintiff's complaints to the complained-of retaliation, the court must define the latter. "The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). To show this injury or harm, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 67–68 (quotation omitted). This is an objective standard that "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id*. at 68–69. The purpose of the antiretaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . [a]nd normally petty slights, minor annoyances, and simple lack of good manners will not" deter a plaintiff from complaining to the EEOC. *Id*. at 68.

Under this objective standard, Plaintiff's performance evaluations, which describe her conduct as meeting or exceeding standards in nearly all respects, do not amount to a materially adverse injury. (ECF Nos. 69-9; 69-13.) As explained above, Plaintiff's performance is described as below standards in only one category. (ECF No. 69-9 at p. 3.) The performance reports did not deter Plaintiff from continuing to report instances of alleged discrimination both internally and to the EEOC. Additionally, in response to the Motion, Plaintiff explains that the comparatively more negative 2019 rating was retaliation for "complain[ing] about her 2018 evaluation" – and not does

not pertain to perceived sex harassment or complaint regarding same.  (ECF No. 69-1 at p. 26.)  Moreover, the email from Ms. Nuri Plaintiff cites as evidence that the negative performance reviews were used as a basis for her termination states: "Her performance has been about meet standards for the last couple reviews."  (ECF No. 69-17 at p. 5.)  Plaintiff asserts she first told Dr. Gullapalli and Ms. Nuri about her EthicsPoint complaints during her 2018 performance review meeting.  (ECF No. 69-3 Spiller-Holtzman Dep. Tr. 52:1–15.)  Ms. Nuri describes her performance reviews from before and after she learned of Plaintiff's protected activity as the same: meeting standards.  (ECF No. 69-17 at p. 5.)  This characterization is appropriate given that the two reports are nearly identical in terms of ratings – both overwhelmingly positive.  (ECF Nos. 69-9; 69-13.)

Plaintiff submitted internal complaints on December 20, 2017 (ECF No. 62-9), December 28, 2017 (ECF No. 62-10), and May 22, 2018 (ECF No. 62-11).  She submitted a complaint with OSEEOC on June 6, 2018 (ECF No. 62-6), and an EEOC charge on August 27, 2018 (ECF No. 62-14).  She received her 2019 evaluation on May 29, 2019.  (ECF No. 62-16.)  She received her notice of termination on December 18, 2019.  (ECF No. 62-24.)

Even crediting the 2019 performance evaluation as a materially adverse employment action, nearly a year elapsed between her most recent complaint and the evaluation.  Over a year passed before her termination.  The court is mindful that:

> an employer is more likely to retaliate against an employee whom it regards as a problem, based on the non-stop filing of complaints, than against one who complained a single time during a multi-year employment tenure. So long as the employer had knowledge of the protected activity (or activities) and effected the adverse action soon after one or more of those activities came to its attention, the causation element of the prima facie case of retaliation is satisfied.

*Siantou v. CVS Rx Servs., Inc.*, No. 8:17-CV-00543-PWG, 2018 WL 6479658, at *11 (D. Md. Dec. 7, 2018).  The Fourth Circuit has explained, however, that an intervening period of three months

may breach the chain of causation. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021). Here, the intervening year-plus between the alleged adverse actions and Plaintiff's complaints strongly militates against a causal connection. Even if, however, Plaintiff could mount evidence of causal connection, and thus a *prima facie* case, she fails to generate a triable issue regarding Defendant's purported non-discriminatory reasons for her termination.

As set forth above, Defendant maintains that Plaintiff's termination was part of a necessary budget reduction. In response, Plaintiff avers numerous reasons why her termination was improper or incorrect. She asserts that "Research Coordinator roles have never been solely dependent on funded grants;" "financial concerns existed" throughout her employment; her duties extended beyond the specific grants on which she worked; Dr. Gullapalli initiated her layoff before receiving instructions regarding budget cuts; Dr. Gullapalli and Ms. Nuri did not consult with appropriate sources to determine alternatives to layoffs; and Ms. Almardawi should have been terminated instead of Plaintiff. (ECF No. 69-1 at pp. 16–22.)

To show Defendant's budgetary rationale for Plaintiff's termination was pretextual, Plaintiff "must establish both that the employer's reason was false and that the retaliation was the real reason for the challenged conduct." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Plaintiff fails to introduce any evidence on which a reasonable factfinder might rely to conclude that Defendant's budgetary constraints were "inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021). Plaintiff's protestations notwithstanding, it is not within this court's purview to question whether Defendant should have allocated its budget differently, consulted certain doctors about alternatives to layoffs, or compared its employees by a different metric than outside funding work. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the

court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted).  As reflected earlier, courts may not act as "a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id*. at 300.

Plaintiff asks this court to make precisely the type of judgments against which the Fourth Circuit expressly warns.  Moreover, Plaintiff fails to generate triable issues of fact regarding the July 2019 timeline of emails and her experience relative to Ms. Almardawi.  The record evidence is undisputed that Dr. Gullapalli and Dr. Melham were engaged in budgetary discussions in July 2019.  Plaintiff cites an email of July 3, 2019, that references that Dr. Gullapalli had recently raised a "layoff concern."  (ECF No. 69-24 at p. 2.)  Nothing about this email contradicts Dr. Melham's account that he told Dr. Gullapalli about the budget issues in July 2019; there is no evidence to support Plaintiff's allegations that Dr. Gullapalli concocted budget troubles to lay her off or sought to lay her off before learning of the budget constraints.  (ECF No. 62-4, Melham Dep. Tr. 15:12–20.)   Plaintiff also asserts she was vastly more experienced than Ms. Almardawi.  (ECF No. 69-1 at p. 7.)  But Plaintiff's experience was across multiple areas/disciplines; Ms. Almardawi had worked consistently in the Department for a longer period of time.  (ECF No. 69-17 at p. 5.)

Overall, Plaintiff's arguments do not demonstrate the types of inconsistencies from which pretext can be inferred.  *See Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (holding that a plaintiff will not survive summary judgment by "focusing on minor discrepancies that do not cast doubt on the explanation's validity").  Accordingly, Plaintiff fails to create a genuine dispute of material fact such that a factfinder reasonably could determine Defendant's reasons for termination were pretextual, and that she would not have been retaliated against had

she not submitted complaints of discrimination.  *See Foster*, 787 F.3d at 252 (explaining that a plaintiff must show the real reason for her termination was her employer's retaliation and she would not have been retaliated "but for her employer's retaliatory animus").  The court will grant summary judgment on Count III in favor of Defendant.

IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, by separate order, the Motion will be granted.


Date: September 16, 2025                                    /s/_____
                                                           Julie R. Rubin
                                                           United States District Judge